UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **ASURION, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 3:23-cv-00424** |
| ) | **Judge Aleta A. Trauger** |
| **BRYAN CAVE LEIGHTON PAISNER** ) | |
| **LLP,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM

Asurion, LLC ("Asurion") has filed a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 8), to which Bryan Cave Leighton Paisner LLP ("BCLP") has filed a Response (Doc. No. 20), Asurion has filed a Reply (Doc. No. 22), and BCLP has filed a Sur-Reply (Doc. No. 28). Oral argument was held May 12, 2023. For the reasons set out herein, the request for a preliminary injunction will be granted.

## I. BACKGROUND[1]

On April 27, 2023, Asurion filed a Verified Complaint, stating one count for declaratory judgment against BCLP. The company seeks a declaration "that it is a violation of Rules 1.9 and 1.10 of the applicable rules of professional conduct for BCLP to represent" the individual founders of a company that Asurion acquired in 2019 ("Acquired Company" and "Acquired Company Founders") in an arbitration. (Doc. No. 1 at 11.)

---

[1] In light of the strong interest in the transparency of the judicial process, the court has drafted this opinion in a manner designed to allow it to be filed to the court's public docket, without the necessity of a seal.

A BCLP attorney represented the Acquired Company on franchise-related matters both before and after the acquisition. In connection with the acquisition, Asurion signed a waiver of conflicts based on the pre-acquisition representation, and the Acquired Company remained a legally distinct subsidiary, such that representing it would not necessarily entail representation of Asurion. Asurion argues, however, that subsequent dealings between the BCLP attorney and Asurion, particularly during a period when Asurion and the Acquired Company shared legal personnel, gave rise to an attorney-client relationship that disqualifies BCLP attorneys from representing Asurion in the currently ongoing matter.

The matter in which BCLP is currently representing the Acquired Company Founders is an arbitration regarding Asurion's handling of the Acquired Company's business, in light of certain pay-out rights reserved to the Founders in connection with the acquisition. Although the individual attorney who is alleged to have previously represented Asurion is not part of the Founders' legal team in the arbitration, Tennessee recognizes the ordinary rule that, "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by" conflict of interest rules, "unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." Tenn. Sup. Ct. R. 8, R.P.C. 1.10. Accordingly, a conflict based on the attorney's past representation would, generally speaking, be imputed to BCLP.

## II. LEGAL STANDARD

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest."

*D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

### III. ANALYSIS

Both parties have briefed these issues under the assumption that the Tennessee Rules of Professional Conduct apply to the underlying situation. The actual choice-of-law analysis applicable to this case might, if contested, be more complicated than that, but the court will treat the matter as stipulated, at least for present purposes. In any event, Tennessee seems to be well within the mainstream regarding the relevant issues. Rule 1.9 of the Tennessee Rules of Professional Conduct provides:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b) Unless the former client gives informed consent, confirmed in writing, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
> > (1) whose interests are materially adverse to that person; and

3

Case 3:23-cv-00424   Document 29   Filed 05/16/23   Page 3 of 10 PageID #: 888

> (2) about whom the lawyer had acquired information protected by RPCs 1.6 and 1.9(c) that is material to the matter.
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Tenn. Sup. Ct. R. 8, R.P.C. 1.9. BCLP argues that it had no such attorney-client relationship with Asurion, and Asurion argues that it did.

"The attorney-client relationship is consensual" and, as such, "it 'arises only when both the attorney and the client have consented to its formation.'" *State v. Jackson*, 444 S.W.3d 554, 599 (Tenn. 2014) (quoting *Akins v. Edmondson*, 207 S.W.3d 300, 306 (Tenn. Ct. App. 2006)). That, however, does not mean that an attorney's subjective belief about whether or not he was retained is controlling. Rather, Tennessee law adopts an objective standard that finds that an attorney-client relationship is formed when the following occurs:

> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
>
>> (a) the lawyer manifests to the person consent to do so; or
>>
>> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or
>
> (2) a tribunal with power to do so appoints the lawyer to provide the services.

*Id.* at 600 (quoting Restatement (Third) of the Law Governing Lawyers § 14 (2000)). Accordingly, an attorney who, for example, objectively manifested consent to representation, while incorrectly believing that some technicality prevented an attorney-client relationship from forming, may still be bound by his objective assent.

Based on the foregoing, the court finds that BCLP formed an attorney-client relationship with Asurion no later than October/November of 2019, based on communications in which Asurion in-house lawyers sought and received legal opinions from the aforementioned BCLP lawyer on issues that were, in context, plainly identified as relevant to Asurion's distinct objectives and interests.[2] (*See* Doc. No. 22-2 at 125–33.) In light of the privilege involved, the court will not go into the details of the underlying communications, of which both parties are aware and on which both parties have presented argument and evidence. Suffice it to say, the court finds BCLP's characterization of the underlying communications as involving merely telling Asurion "how [the attorney] would advise" the Acquired Company to be inconsistent with the content of the communications themselves. (*See* Doc. No. 20 at 4) More broadly speaking, the court finds it unlikely that a communication that otherwise would amount to the formation of an attorney-client relationship can be inoculated from such a finding simply by the attorney's characterizing his advice as the advice he would give to his client.

BCLP therefore should be disqualified if the prior representation was substantially related to the matter in arbitration. "Matters are 'substantially related' for purposes of [Rule 1.9] if they (1) involve the same transaction or legal dispute or other work the lawyer performed for the former client or (2) if there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter, unless that information has become generally known." Tenn. Sup. Ct. R. 8 (1.9), Cmt. [3]; *see also Culpepper v. Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.*, No. E2019-01932-COA-R3-CV, 2020 WL 6112985, at *8 n.4 (Tenn. Ct. App. Oct. 16, 2020). The Rules further explain:

---

[2] The court's finding is without prejudice to the conclusion that any other communications might have been independently sufficient to form an attorney-client relationship.

> Even where the current matter does not involve the work previously done by the lawyer for the former client, it may still be substantially related to the former matter if there is a substantial risk that confidential factual information that would normally be obtained in the prior representation would materially advance the client's position in the subsequent matter. For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then ordinarily represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent.

Tenn. Sup. Ct. R. 8 (1.9), Cmt. [3b].

The advice that the BCLP attorney gave Asurion explicitly involved the process of mixing the branding, business models, and operations of Asurion and the Acquired Company. In that process, the BCLP attorney received not only specific facts related to Asurion's query, but also a glimpse into Asurion's internal thinking and sense of urgency (insofar as one existed) about this process. The co-branding at issue in 2019 was considerably more restrained than Asurion's later steps that, according to the Acquired Company Founders, approached an outright cannibalization of the Acquired Company by its acquirer. The differences between the two situations, however, were not due to their being unrelated, but because 2019 and 2023 represent two different points along the same path. A BCLP attorney helped Asurion turn the Acquired Company's operations into something a little less distinct and a little more just a piece of Asurion. That process, taken to a much further extreme, is what the current arbitration is about, at least in part.[3]

BCLP nevertheless takes pains to draw narrow lines that supposedly demarcate the subject of its prior representation and the current conflict between Asurion and the Founders. If

---

[3] Moreover, the BCLP attorney specifically consulted on matters related to Asurion's strategy with regard to certain foreign Acquired Company locations, and Asurion's strategy regarding the Acquired Company in the relevant nation is central to the arbitration. (*See* Doc. No. 22-5 ¶ 14.)

the current conflict were only about such minute details, then those arguments might carry some weight. It is clear, however, that one of the contested issues in the arbitration is going to be the extent of Asurion's good faith. Accordingly, what matters is not simply any individual instance of the two brands' commingling, but also Asurion's general attitudes, methods, and motivations in connection with that process as a whole. Such questions directly implicate attitudes of internal Asurion stakeholders that were revealed to BCLP. A direct conflict accordingly exists, both because (1) the earlier advice and the arbitration involve the same ongoing business process and (2) specific information revealed by Asurion bears directly on the arbitration.[4]

BCLP argues that Asurion would not actually be harmed by BCLP's representation of the Acquired Company Founders, and that may, as a practical matter, be true. The same, however, could be said about many large-firm conflicts—even quite clear ones—that rely on Rule 1.10's imputation of a conflict from one attorney to an entire firm. BCLP's conflict is not based on the attitudes, actions, or knowledge of the attorneys who currently represent the Founders. BCLP's conflict exists because, as a matter of law, those attorneys possess the same conflicts as the attorney who actually *did* represent Asurion. The potential for conflict therefore must be assessed as if that attorney were representing the Founders himself—not based on the court's best guess of how the other BCLP attorneys will behave. As the court has held, that attorney's window into Asurion's internal thinking about the combination of the brands and related decisions amounts to an actual, non-speculative advantage in the current arbitration, giving rise to a conflict under the Rules.

The firm-wide imputation of conflicts embodied by Rule 1.10 is an aggressive policy, and it is not hard to see why both attorneys and clients would find it frustrating. The Tennessee

---

[4] The court holds, without deciding the underlying legal question, that, insofar as a heightened burden exists for establishing a conflict in connection with an already-pending proceeding, Asurion has made a sufficient showing to satisfy that burden. (*See* Doc. No. 28 at 2–3.)

Rules of Professional Conduct, however, embrace that policy and provide no way around it in this instance. The Rules permit the use of screening to avoid the imputation of some conflicts, but only "if a lawyer is personally disqualified from representing a person with interests adverse to a client of a law firm with which the lawyer *was formerly associated*." Tenn. Sup. Ct. R. 8, R.P.C. 1.10(c) (emphasis added); *see also Indus. Prod. Grp., Inc. v. Aztech Indus. Supply, Inc.*, No. M2005-00403-COA-R3CV, 2006 WL 1763654, at *1 n.2 (Tenn. Ct. App. June 27, 2006) (explaining that an ethical screen is a "mechanism . . . designed to allow a lawyer to move to a new job without the fear of vicariously disqualifying the new employer from representing certain clients"). That does not describe this situation. Moreover, even where a screen would be sufficient in the abstract, it can only resolve a conflict if introduced promptly, before any representation could be tainted. *See* 32 Am. Jur. 2d Fed. Cts. § 156 (citing *U.S. ex rel. Bahsen v. Bos. Sci. Neuromodulation Corp.*, 147 F. Supp. 3d 239, 248 (D.N.J. 2015). A wall can only enforce a boundary that has not yet been crossed. The court accordingly finds that Asurion has shown a significant likelihood of success on the merits.

The other preliminary injunction factors similarly favor Asurion. The public interest is strongly served by the maintenance of the obligations of privilege and loyalty that define the attorney-client relationship. The Acquired Company Founders will miss out on their preferred counsel, but that is a commonplace occurrence in corporate dealings, which often involve large, repeat-player firms like BCLP. It was, moreover, the Acquired Company Founders' choice to retain a law firm with an obvious risk of a conflict—a risk of which they were undoubtedly aware, given that they already obtained a waiver of said conflict up to a certain date. Any resultant delay in the arbitration may be regrettable, but it is a lesser evil than a violation of

Asurion's relationship with an attorney from whom it solicited and received advice on matters closely related to the underlying conflict.

There is, however, one aspect of Asurion's requested relief that the court will not provide. On the day of the court's hearing of this matter, Asurion, for the first time, asked the court to hold that the Founders' "notices of commencement of a negotiation, mediation, and arbitration process under the agreements are not effective given the substantial likelihood of a conflict of interest that deprived Asurion of the benefit of those bargained-for time periods." Those time periods are prerequisites to arbitration pursuant to the parties' binding arbitration provision. The question of whether the Acquired Company Founders are entitled to a finding of compliance with those requirements is therefore a procedural issue squarely encompassed by the pending arbitration. The court will not interfere with that process in the absence of a compelling argument that such meddling would be permissible, which Asurion has not provided.[5]

Finally, the court turns to the topic of bond. This court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Asurion argues that its likelihood of success on the merits is so high that it should not be required to post any security. The court, however, found these questions to be reasonably debatable, such that there is a meaningful risk that the court's decision will ultimately be found to have been in error. The monetary stakes of the underlying arbitration are, moreover, exceedingly high, and the Founders' loss of their counsel of choice is likely to entail real costs. The court, accordingly, will require security in the amount of $100,000.

---

[5] Asurion also added a last-second request for specific language identifying certain documents as covered by their requested claw-back. The court, however, is not in a position to judge the privileged nature of any specific potential claw-back documents and will formulate the claw-back obligation only broadly.

## IV. CONCLUSION

For the foregoing reasons, Asurion's Motion for Preliminary Injunction (Doc. No. 8) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge